UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| UNITED STATES | * | |
| --- | --- | --- |
| | * | |
| | * | |
| v. | * | CRIMINAL NO. L-10-0561 |
| | * | |
| ANGEL BATISTA, et al. | * | |
| Defendants | * | |

*******

MEMORANDUM

Defendants Angel Batista and Robert Nunez have each been charged with one count of possession with intent to distribute and aiding and abetting. The case stems from a traffic stop of a vehicle driven by Nunez and in which Batista was the sole passenger. As a result of a canine scan performed during the stop, the Government recovered two packages of heroin from a secret compartment in the vehicle.

Pending is the Defendants' joint motion to suppress. Docket No. 39. On April 11, 2011, the Court received evidence and heard argument on the motion. Following the hearing, counsel for both parties submitted supplemental briefs. In a Letter Order of April 26, 2011, the Court denied the Motion. This Memorandum explains the reasons for that ruling.

**I.     Background**

On August 3, 2010, Maryland State Police Corporal Chris Armiger was traveling southbound on Interstate 95 in Harford County, Maryland. He observed a Chevrolet Impala with a burned-out license plate lamp traveling in the same direction. Corporal Armiger stopped the vehicle at approximately 1:41 a.m. and radioed for back-up.

Nunez was the car's driver, and Batista, who was seated in the front passenger seat, was the sole passenger. Corporal Armiger quickly observed several facts that led him to suspect that

the Defendants were engaged in drug trafficking. First, he detected a mist and strong odor of cologne in the car's interior. Second, Nunez's driver's license was wet and also smelled of cologne. As Corporal Armiger testified, drug traffickers frequently use masking agents such as cologne and air fresheners in an attempt to foil canine scans. Third, the car was devoid of any personal items or luggage. Finally, Batista possessed a New York driver's license, Nunez possessed a Florida's driver license, and the car was registered to a third individual from New York.

Corporal Armiger asked Nunez to move to the rear of the vehicle, frisked him, and questioned him about his destination. Nunez stated that he and Batista were travelling to Delaware. Corporal Armiger found this answer suspicious because he had stopped the vehicle travelling southbound approximately nineteen miles south of the Maryland/Delaware state line.

Officer Lubacker then arrived on the scene and entered Corporal Armiger's cruiser. Corporal Armiger returned to his vehicle, related the above facts to Officer Lubacker, and returned to the Defendants' vehicle to question Batista. During this time, Nunez stood between Corporal Armiger's cruiser and the stopped vehicle.

Batista, who remained in the front passenger seat, informed Corporal Armiger that he and Nunez were travelling to Baltimore to meet Batista's girlfriend for a hotel party. Corporal Armiger returned to his patrol car and called in routine checks on the Defendants' drivers' licenses. He then decided to conduct a canine scan of the vehicle with his dog, Justice, who was waiting in the car.

Following standard police procedure, Corporal Armiger asked Officer Lubacker to order Batista out of the Defendants' car. Corporal Armiger testified that this is done to protect the canine as well as the vehicle's occupants. On the videotape, Officer Lubacker can be seen

approaching the stopped vehicle.  Nunez, who is casually leaning on the front of Corporal Armiger's cruiser, partially obstructs the camera.  Batista can be seen exiting the stopped car, but the viewer cannot see whether Officer Lubacker or Batista opened the door.

While Officer Lubacker patted down Batista at the car's rear on the passenger side, dispatch advised Corporal Armiger that Batista was on federal supervised release and a known member of the Latin King and Queen Nation gang.  After he finished the pat-down, Officer Lubacker directed Batista to stand beside Nunez.  Batista walked away from the stopped car and did not attempt to close the open door.  Officer Lubacker then began to close the door but stopped.  Ultimately, the door stayed open.

Corporal Armiger then exited his cruiser with Justice.  Justice began his scan at the rear of the stopped vehicle on the passenger's side.  Corporal Armiger testified that Justice alerted to the odor of narcotics as soon as he approached the stopped vehicle.  He began to walk towards the open door and then hopped into the car.  After Justice exited the car, he made his final alert, which indicated to Corporal Armiger that Justice had come as close as possible to the source of the odor.

While Officer Lubacker stayed with the Defendants, Corporal Armiger began to search the car.  At approximately 2:02 a.m., he located two packages of heroin concealed within a secret compartment.  The officers then placed the Defendants under arrest.

## II.     Analysis

The Defendants concede that Corporal Armiger was authorized to stop the vehicle.  It is uncontroverted that the license plate light was, indeed, burned out.  Thus, the Defendants focus

their argument on two issues. First, whether the stop was unreasonably prolonged, and second, whether the officers "facilitated" Justice's entry into the car through the opened passenger door.[1]

### A. Whether the Stop Was Unreasonably Prolonged

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is a seizure for purposes of the Fourth Amendment. Following the Supreme Court's decision in Terry v. Ohio, an officer who observes a traffic violation may "detain the offending vehicle for so long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008) (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

The scope of a routine traffic stop is limited. Specifically, "the officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Brugal, 209 F.3d 353, 358 (4th Cir. 2000) (en banc). A canine sniff for controlled substances is not a search for purposes of the Fourth Amendment. Therefore, if the sniff does not extend the stop beyond the time required to perform the traditional incidents, there is no violation of the Fourth Amendment. See United States v. Branch, 537 F.3d 328, 335-36 (4th Cir.

---

[1] The parties focused much of their briefing on the issue of whether Batista, the passenger, has standing to challenge the search of Nunez's vehicle. Because the Court finds that the stop and subsequent search were constitutional, see Part II.A-B infra, it need not reach this issue. Nevertheless, a brief analysis is as follows.
     Normally, a passenger in a car has no legitimate expectation of privacy in "an automobile in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object." United States v. Carter, 300 F.3d 415, 421 (4th Cir. 2002). Batista relies on a narrow exception to this rule. In Brendlin v. California, 551 U.S. 249 (2007), the Supreme Court held that when a police officer makes a traffic stop, a passenger is seized within the meaning of the Fourth Amendment and, therefore, may challenge the constitutionality of the stop. More recently, in dicta, the Fourth Circuit observed that car searches may be challenged by passengers as the "fruits" of the traffic stop. See United States v. Allison, No. 09-4328, 2010 WL 4137513, at *2 (4th Cir. Oct. 18, 2010) (citing Wong Sun v. United States, 371 U.S. 471, 484 (1963)). Thus, it appears that Batista may challenge the constitutionality of the underlying stop and seek to have the evidence excluded as the fruit of the poisonous tree.

2008). If, however, a canine sniff extends the stop beyond the traditional incidents, further detention is "illegal unless the officer has a reasonable suspicion of a serious crime." Id.

As a threshold matter, the stop in this case lasted for nine minutes before Justice made his alert. This is an entirely reasonable duration for a routine traffic stop. Several circuits, including the Fourth Circuit, have upheld routine stops that have lasted fifteen minutes or longer. See, e.g., United States v. Montes, 280 Fed. Appx. 784 (10th Cir. 2008) (unpublished) (15 minute stop during which officer contacted dispatch, discussed defendant's failure to signal, obtained information necessary for citation, learned of defendant's travel plans, and discussed defendant's ownership of vehicle); United States v. Branch, 537 F.3d 328 (4th Cir. 2008) (30 minute stop during which defendant actively misled officer as to identity of car owner); United States v. Mincey, 321 Fed. Appx. 233 (4th Cir. 2008) (unpublished) (35 minute stop during which officer had difficulty verifying defendant's license and had to contact rental car company to determine whether defendant was authorized to drive car).

While the stop was brief, the Defendants contend that the officers unnecessarily extended it by questioning the men. Their argument centers on the minor nature of the driving infraction. A burned out license plate light does not warrant questioning motorists about their travel plans, they posit. The Court disagrees. The "traditional incidents" test is designed in part to create a bright-line rule that avoids a minute inquiry into every question asked and every action taken. Moreover, there is no rule that requires the police to limit their inquiry in light of the infraction. A motor vehicle stop is a Terry stop entitling the police to ask routine questions such as who owns the car, where the men are going, and whether the driver has a license. See, e.g., United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009).

The Defendants also argue that the scan itself unreasonably extended the duration of the stop. The Court rejects this argument for several reasons. First, the short duration of the stop also dooms this theory. Second, the scan only extended the stop for one minute. Thus, any intrusion on the Defendants' Fourth Amendment rights was de minimis. Third, by the time Cpl Arminger decided to scan the car, the officers suspected a serious drug violation and not merely a burned out bulb. Among other things, the officers had taken note of the unusual spraying of cologne, the lack of luggage, the contradictory answers of the men, and Batista's criminal history. Taken together, these facts justified extending the stop so that the officers could investigate their suspicions. See United States v. Mason, 628 F.3d 123 (4th Cir. 2010).

**B.     Whether Justice's Entry into the Vehicle Was an Unlawful Search**

The Defendants also argue that Justice's entry into the vehicle violated the Fourth Amendment. Under the Fourth Amendment, a canine scan of a vehicle's exterior is not a search requiring a warrant or probable cause. See, e.g., United States v. Hardy, 855 F.2d 753, 758-59 (11th Cir. 1988). Scanning a car's interior raises a different set of issues, however, because persons have reasonable expectations of privacy in the interiors of their automobiles. Ordinarily, therefore, the police may not search an automobile unless they have probable cause to believe it contains contraband. See Almeida-Sanchez v. United States, 413 U.S. 266 (1973).

A line of cases has developed that addresses the circumstances under which a dog's entry into a vehicle violates the Fourth Amendment. These cases hold that a dog may enter a car if its actions are "instinctive," but that the police may not act with the intent to "facilitate" a sniff of the interior. See United States v. Curry, Cr. No. 09-0483, 2010 WL 2858009, *3 (D. Md. Jul. 19, 2010) (summarizing cases). This rule stems from the principle that "in the absence of police

misconduct there is no basis for applying the exclusionary rule." United States v. McKoy, Cr. No. 06-032, 2007 WL 891356 (D.D.C. Mar. 22, 2007).[2]

Turning to this case, the Defendants contend that the officers ordered Nunez out of the vehicle and left the door open because they intended to "facilitate" a sniff of the interior. As mentioned above, standard police procedure dictates that the occupants of a car must exit and remain outside for the duration of a canine scan. At the time that Corporal Armiger ordered the scan, Nunez was already outside of the vehicle. The video fails to establish whether Batista or Officer Lubacker opened the passenger's side door. The video does show, however, that Officer Lubacker started to close the door but stopped. It is unknown whether he intentionally left the door open or not.

If Officer Lubacker left the car door open to give Justice a better smell of the inside, that is permissible. If Lubacker left the door open as an invitation to jump inside, that would be impermissible. The Fourth Amendment is offended only if the dog fails to alert outside the car and the officers "facilitate" the dog's entry into the car by letting him in or by leaving a door or window open in hopes that the dog will jump in.

In the instant case, there are several dispositive facts. First, Corporal Arminger testified that Justice alerted as soon as he approached the car. Thus, probable cause was established before Justice hopped in. Second, from the video-recording, it does not appear that Officer Lubacker left the door open in order to invite Justice to enter. The stop unfolded quickly, and Justice alerted moments after Officer Lubacker stepped around the open door.

---

[2] In McKoy, for example, the court denied the defendant's motion to suppress, finding that the dog entered the car by acting instinctively. On reconsideration, however, the court noted that the dog actually entered the vehicle twice and held that "the police should not have permitted the dog to [enter the car] a second time." United States v. McKoy, No. 06-032, 2007 WL 2301754 (D.D.C. Apr. 19, 2007).

7

Thus, United States v. Winningham, upon which the Defendants place great reliance, is easily distinguishable from this case. There, the officers opened the door themselves, allowing the vehicle to "sit on the side of the highway with the sliding door wide open for a period of at least six minutes." 140 F.3d 1328, 1331 (10th Cir. 1998). Moreover, the dog was not on the scene, reasonable suspicion had been exhausted before the dog arrived, and the dog handler "unleashed the dog as the dog neared the open door." Id.

Finally, the law allows the police, during a traffic stop, to open a car's windows or doors to afford the dog a better field of scent. This rule might be different if, during a police stop, the driver and the passengers were constitutionally entitled to remain in the sealed car. Such is not the case, however. The police are allowed to require the driver to roll down his window and exit the car. Before the scan begins, the police are entitled to require all of the car's occupants to open their doors and step outside. It would be foolish to require the police to close all of the doors and windows, and wait a time for the wind to blow the escaped air away, before the scan can begin.

## III. Conclusion

As stated in the Court's Letter Order of April 26, 2011, the Defendants' joint Motion to Suppress (Docket No. 39) is DENIED.

/s/
Benson Everett Legg
United States District Judge